UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LILLIAN EUGENIO, RUBY ABRAHAM,
KAREN D'ANNA,[1]

                          Plaintiffs,                          **REPORT AND**
                                                              **RECOMMENDATION**

            -against-
                                                              06 Civ. 4928 (CS) (GAY)
MARILYN WALDER, BERNARD P. PIERORAZIO,
VINCENT A. McPARTLAN, PASQUALE
PICCIRELLA, and the YONKERS CITY SCHOOL
DISTRICT,

                          Defendants.
----------------------------------------------------------------X


TO THE HONORABLE CATHY SEIBEL, United States District Judge:

        Plaintiffs Lillian Eugenio ("Eugenio"), Ruby Abraham ("Abraham"), and Karen

D'Anna ("D'Anna") bring this action under Title VII of the Civil Rights Act of 1964 (42

U.S.C. §§ 2000e to 2000e-17); 42 U.S.C. § 1981; the First Amendment of the United

States Constitution, and New York's Human Rights Law (N.Y. Exec. Law §§ 290-300).

Plaintiffs assert these claims against defendants Marilyn Walder ("Walder"), Bernard P.

Pierorazio ("Pierorazio"), Vincent A. McPartlan ("McPartlan"), Pasqualle Piccirella

("Piccerella"), and the Yonkers City School District ("District") for allegedly retaliating

against them for making a complaint about race discrimination of District African-

American children.  Presently before this Court are defendants' motions[2] for summary

_____

        [1] The amended complaint originally included plaintiff Gwendolyn Sherman.
However, the parties stipulated to the discontinuance of her claims.  Docket # 50.

        [2] Defendants moved individually for summary judgment against each of the
above-named plaintiffs.

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  For the reasons that follow, I respectfully recommend that defendants' motions should be GRANTED.

## I. BACKGROUND

The following facts are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions.  Any disputes of material fact are noted.

Lillian Eugenio is employed by the Yonkers City School District as a licensed practical nurse at Public School 29 ("P.S. 29").  Ruby Abraham is also employed by the Yonkers City School District where she works as a registered nurse at P.S. 29.  Karen D'Anna is an employee of the Yonkers City School District, serving as an aide at P.S. 29.  She usually works in the nurses' office with Eugenio and Abraham.  Eugenio and D'Anna are Caucasian, and Abraham is of Asian national origin.

Marilyn Walder was employed by the Yonkers City School District for all times relevant to plaintiffs' claims.  Walder served as the building principal of P.S. 29 from some time in 1991 until June 6, 2006.  She is African-American.

Bernard P. Pierorazio, Vincent A. McPartlan, and Pasquale Piccirella are employed by the Yonkers City School District.  At all times relevant to plaintiffs' claims, Pierorazio served as the Interim Superintendent or Superintendent of Schools of the District, McPartlan held the position of Executive Director of Pupil Support Services and

Special Education, and Piccirella was the Director of District Safety and Security. Pierorazio, McPartlan, and Piccirella are Caucasian.

Both New York State law and District policy require that any school official or employee is a mandatory reporter of suspected child abuse.  Plaintiffs' Ex. 42.  The law requires that the person who identifies the suspected child abuse should directly call the Reporters' Hotline.  <u>See</u> Plaintiffs' Exs. 34-35.  Plaintiffs contend that school policy required them, contrary to state law, to report to the building principal the suspected abuse, who would then report to the hotline.  <u>See, e.g.</u>, Plaintiffs' Ex. 1, Eugenio Tr. 122:4-11; 129:2-8; Plaintiffs' Ex. 42.  Plaintiffs further assert that Walder "repeatedly and consistently opposed [their] [Child Protective Services ('CPS')] reports on her expressed premise that the making of such reports is destructive of the social fabric of African-American families . . . ."  First Amended Complaint ¶ 13.  Nonetheless, plaintiffs followed state law and continued to make CPS reports directly to the hotline.  <u>Id.</u> ¶ 14. As a result, plaintiffs allege that Walder retaliated against them by, for example, prohibiting them from making the reports without her permission, subjecting them to verbal abuse, reassigning D'Anna to other locations to allegedly punish the nurses' office, removing equipment from the nurses' office, violating their right to anonymity in reporting suspected child abuse, demeaning plaintiffs in public, and reprimanding them. <u>Id.</u>

As a result of Walder's conduct, plaintiffs made formal complaints that Principal Walder discriminated against African-American and special education children at P.S. 29, and interfered with their legal duties and obligations thus endangering the safety of said children.  First Amended Complaint ¶ 15; Memo. of Law on Behalf of Plaintiffs

3

Eugenio, Abraham, and D'Anna in Opp. to Defendants' Mot. for Summary Judgment at

4 [hereinafter "Plaintiffs' Memo"].

On September 20, 2005, Eugenio and Abraham wrote a joint letter to Larry

Sparber,[3] Labor Relations Specialist at their union, CSEA.  Plaintiffs' Ex. 14.  They

complained that Walder interfered with and retaliated against them in connection with

making CPS reports.  Id.  They claimed that she hindered their ability to do their jobs

and placed children in jeopardy.  Id.  They requested a meeting with Pierorazio and

notified that they would consult an attorney.  Id.  On September 21, Bobbie DiBattista

("DiBattista"), plaintiffs' union president, met with Sparber, Eugenio, and Abraham to

discuss the nurses' complaints.  DiBattista's Notes, Plaintiffs' Ex. 16.  DiBattista and

Sparber met with Pierorazio on September 28 regarding said complaints.  Id.  On

November 3, 2005, DiBattista and Pierorazio together met with Eugenio and Abraham.

Id.

Following this last meeting, Pierorazio stated he would order an investigation,

specifically calling the matter a "Title VI" issue, and referred the investigation to

Piccirella.  Plaintiffs' Memo at 10.  On November 9, 2005, Eugenio, Abraham, and

D'Anna wrote formal complaints on "Title VI" forms at the request of DiBattista.  Id.  In

response to those complaints, Piccirella found that plaintiffs did not suffer ill treatment

because of their race, color, national origin, religion or gender, and thus a violation of

Title VI did not occur.  Plaintiffs' Exs. 26-27.  Nonetheless, Piccirella noted that the

plaintiffs suffered from a hostile work environment and the District should attempt to

resolve the situation.  Id.  Following Piccirella's findings, on December 1, 2005,

---

[3]  Plaintiffs addressed the letter to "Mr. Starber."

Superintendent Pierorazio urged McPartlan and Sharon Woods, Director of Elementary Education ("Woods"), to "[i]ntercede as needed in an attempt to resolve" the hostile work environment.  Plaintiffs' Ex. 28.  Pierorazio sent the same letter on January 3, 2006 as a "second request."  Plaintiffs' Ex. 29.

On January 17, 2006, Sparber sent a letter to Pierorazio seeking information on a resolution to plaintiffs' complaints.  Plaintiffs' Ex. 30.  In his letter, Sparber described the pending issues as "several serious issues of harassment and administrative mismanagement directed against the nurses of School 29 by the Principal, Marilyn Walder."  Id.  He also asked what the District planned on doing to "insure the safety of children involved with CPS."  Id.  He stated that Piccirella's reports substantiated the plaintiffs' claims.  Id.  On February 9, 2006, Sparber sent another letter to Pierorazio, stating that Pierorazio had not followed up on the situation, "despite a conclusive report by Mr. Piccirella that harassment and unprofessional behavior on the part of Ms. Walder was continuing."  Plaintiffs' Ex. 31.  Sparber advised that plaintiffs and the CSEA would bring their complaints to outside parties in order to obtain a resolution because "the CSEA [could not] allow [its] members to feel threatened or be put in jeopardy."  Id.

McPartan finally investigated the matter by conducting interviews with the plaintiffs on February 14, 2006.  Plaintiffs' Exs. 33-35.  McPartlan made several recommendations for the school to adopt, including procedures for CPS and 911 calls, forbidding retaliation and intimidation tactics against any party as a result of the complaints, and advising that if "all parties are unable to work cohesively, . . . [have them] attend Human Relations and Conflict Resolution sessions."  Plaintiffs' Ex. 36.  On March 14, 2006, Eugenio and Abraham wrote to McPartlan regarding continuing

5

conflicts with Walder and his refusal to take their call on the matter.  Plaintiffs' Ex. 38.
At this time, they advised him that they had "no alternative but to seek help from the
proper authorities for the safety and well-being of our children, staff and district."  Id.

On April 4, 2006, plaintiffs wrote a letter to Pierorazio summarizing from their
initial complaints the situation with Walder and the District, repeatedly stating that
Walder interfered with their calls to CPS when they suspected an African-American
student was abused.  Plaintiffs' Ex. 39.  A copy of this letter was sent to the Gannett
Suburban Newspapers.  Id.  On April 5, 2006, said paper published a corresponding
article.  Plaintiffs' Ex. 53.  The article focused on Walder's interference with CPS calls
and the welfare of the students at the school.  Id.

On May 2, 2006, each plaintiff filed a complaint with the United States Equal
Employment Opportunity Commission ("EEOC").  First Amended Complaint ¶ 2.  The
EEOC issued individual Notices of Right to Sue to the plaintiffs on June 29, 2006.  Id.
Plaintiffs' first filed their complaint in connection with the present matter on June 27,
2006.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  FRCP 56(c).  When deciding a summary judgment
motion, the Court must resolve all ambiguities and draw all factual inferences in favor of
the nonmoving party.  See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999).

The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party.  See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Where a plaintiff fails to establish an essential element of her claim, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

   "When a case turns on the intent of one party, as employment discrimination claims often do, a 'trial court must be cautious about granting summary judgment.'" Hernandez v. N.Y. City Law Dep't Corporate Counsel, No. 94 Civ. 9042, 1997 WL 27047, *7 (S.D.N.Y. Jan. 23, 1997) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 224).  Nonetheless, the Second Circuit has expressly "remind[ed the] district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable."  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quotation and citation omitted).  On the one hand, mere conclusory allegations of discrimination will not defeat a summary judgment motion; a plaintiff in a discrimination case must proffer "concrete particulars" to substantiate his claim.  See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  On the other hand, courts must be aware of the fact that "discrimination will seldom manifest itself overtly." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).  Courts must therefore "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Id. Thus, the ultimate question in deciding a summary judgment motion in a discrimination

case "is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances."  Id.

### III.  FIRST AMENDMENT CLAIM[4]

Plaintiffs allege that defendant Walder retaliated against them, in violation of the First Amendment, for making mandatory reports to CPS of suspected child abuse of African-American children at P.S. 29.  Plaintiffs allege that defendants Piccirella, Pierorazio, and McPartlan are liable for Walder's behavior for failing to address plaintiffs' complaints.  Plaintiffs contend that the District is liable as defendants' employer.  Defendants contend that plaintiffs' First Amendment claims cannot survive because their statements regarding child abuse and the actual filing of reports of child abuse are statements made in their capacities as employees of the District.  Defendants further contend that Abraham and D'Anna did not suffer adverse employment actions or establish a causal connection between the alleged protected activity and alleged adverse action.  Finally, defendants argue that even if D'Anna can establish a prima facie case for First Amendment retaliation, the District would have taken the same adverse actions regardless of the alleged protected activity.

To state a claim for retaliation in violation of the First Amendment, public employees must demonstrate that (1) "'the speech at issue was made as . . . citizen[s] on matters of public concern'"; (2) they suffered an adverse employment action; and (3) "'the speech was at least a substantial or motivating factor in the [adverse employment

---

[4] Plaintiffs properly plead that their First Amendment claims are actionable pursuant to 42 U.S.C. § 1983.

action]." Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005) (citing Johnson v. Ganim,

342 F.3d 105, 112 (2d Cir. 2003)).  Conclusory statements of retaliation are not enough

to assert a claim.  See Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) (stating that

"[c]onclusory allegations or denials are ordinarily not sufficient to defeat a motion for

summary judgment").  Even in the presence of a retaliatory motive, a plaintiff's claim

may still fail if the defendants "can show dual motivation, i.e., that even without the

improper motivation the alleged retaliatory action would have occurred."  Id. at 287-88.

Thus, the plaintiff "has the initial burden of showing that an improper motive played a

substantial part in defendant's action. The burden then shifts to defendant to show it

would have taken exactly the same action absent the improper motive."  Id. at 288.

      Whether "the speech addresses a matter of public concern must be determined

by the content, form, and context of a given statement, as revealed by the whole

record."  Connick v. Myers, 461 U.S. 137, 147-48 (1983).  Such inquiry is a matter of

law.  Id. at 148 n.7.  A court must balance "'the interests of the [employee], as a citizen,

in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its

employees.'" Id. at 142 (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1972)).

However, "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate the communications from employer discipline."  Garcetti

v. Ceballos, 547 U.S. 410, 421 (2006).  Thus, expressions "most accurately

characterized as an employee grievance concerning internal office policy," do not give

rise to First Amendment protections.  Connick, 461 U.S. at 154.

Plaintiffs allege that they were retaliated against for making complaints of child abuse as required by New York State law and their duties as nurses at P.S. 29.  See Plaintiffs' Memo at 3.  Plaintiffs also allege that they were retaliated against for making a complaint that a district official, Walder, discriminated against African-American children because she interfered with CPS calls made on the children's behalf.  Id.  Plaintiffs contend that their complaints regarding Walder's discrimination of African-American children, interference with CPS reporting, interference with the duties of the nurses' office, among other things, amounted to matters of public concern.  Id.  They assert that Walder's retaliatory acts amounted to adverse employment actions.  Id. at 5-6.

The Supreme Court made clear in Garcetti v. Ceballos that "expressions an employee makes pursuant to his or her official responsibilities" are not protected by the First Amendment.  547 U.S. at 424.  In establishing this precedent, the Court declined to adopt a broader rule that would mandate "judicial oversight of communications between and among government employees and their superiors in the course of official business."  Id. at 423.  Following Garcetti, the Second Circuit, when deciding a public employee's First Amendment retaliation claim, has focused on what the employee's official duties encompassed.

In Pagani v. Meriden Board of Education, the District Court for the District of Connecticut found that a teacher's official duties included mandatory reporting of suspected child abuse to the Connecticut Department of Children and Families ("DCF").  No. 05 Civ. 01115, 2006 WL 3791405, at *4 (D.Conn. Dec. 19, 2006).  Both Connecticut law and the plaintiff's job description required such reporting.  Id. at *3.  Thus, the court held that plaintiff, a school teacher, was not speaking on a matter of public concern

10

when he made a complaint to DCF.  Id.  Accordingly, the teacher had no actionable

retaliation claim when the school district demoted him shortly after he filed the complaint

contrary to the school principal's advice.  Id. at *1-2.

The Second Circuit Court of Appeals also held that when a teacher had a duty to

report on a safety issue, such reporting did not fall under constitutional protections.  Porr

v. Daman, No. 07 Civ. 1623, 2008 WL 4831426, at *2 (2d Cir. Nov. 7, 2008).  In that

case, Porr, a teacher at a public school in the Bronx, alleged that the principal,

superintendent, and others harassed him in retaliation for grievances he made

regarding a lack of discipline in the school and the school's inadequate response to a

fire alarm.  Id. at *1.  Porr's discipline complaints stemmed from a conflict he had with

another teacher, Ramracha, and Ramracha's failure to prevent his students from

assaulting Porr.  Id.  The Second Circuit noted that school regulations required teachers

to report fire safety issues to the principal.  Id.  Accordingly, Porr's complaints regarding

fire safety were a part of his official duties, thus not afforded First Amendment

protections.  Id.  Regarding Porr's complaints about Ramracha, viewing the "'content,

form, and context'" of his grievances, the Court held that said grievances were of an

"ongoing personal dispute."  Id. at *2 (citing Connick, 461 U.S. at 147-48).  As such,

Porr's complaints were not a matter of public concern.  Id. (citation omitted).

 Specifically, the Second Circuit analogized to a prior decision to determine that the

complaints "'generally related to [Porr's] own situation . . . [and he] was not on a mission

to protect the public welfare.  Rather, [his] primary aim was to protect [his] own

reputation and individual development.'" Id. (quoting Ezekwo v. New York City Health &

Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991)).  Thus Porr's complaints regarding the

dispute with his co-worker were not protected.

In the present case, plaintiffs assert that their retaliation claims arise from their complaints that Principal Walder discriminated against African-American children and interfered "with their duties and legal obligations, thus endangering the safety of children."  Plaintiffs' Memo at 4 (emphasis omitted).  Plaintiff Eugenio testified that she made complaints because she was "concerned with all the safety of the children" in connection with reporting to CPS.  Plaintiffs' Ex. 1, Eugenio Tr. 407:22-408:2.  Eugenio also testified that she complained to Superintendent Pierorazio about the discrimination of African-American students because Principal Walder intimidated the nursing staff when they made calls to CPS of suspected abuse of said children.  Id. at 527:14-528:3.  Eugenio conveyed the same to Piccirella.  Id. at 529:22-530:10.  Eugenio wrote to Piccirella on a Title VI complaint form that she was "discriminated against because [she] followed Yonkers Public School Policy [and New York State] mandates.  Plaintiffs' Ex. 21.  She further stated that "Ms. Walder has made [her] work place stressful [and] hostile."  Id.

The gravamen of Abraham's complaint to Pierorazio was that Walder was hostile to the nursing staff.  See, e.g., Plaintiffs' Ex. 2, Abraham Tr. 493:12-24; 506:2-19 (Walder allegedly unnecessarily required a nurse to accompany a student in an ambulance even though the parent was present; Walder allegedly identified to a parent that the nursing staff called CPS).  Abraham wrote to Piccirella on a Title VI complaint form that she was "placing a formal complaint against Ms. Walder" because she felt she was being "discriminated [against] because [she] . . . followed the Yonkers School [D]istrict policy and [New York] State mandate."  Plaintiffs' Ex. 23.  She complained that

12

Walder harassed her and hindered her ability to perform her job duties, both of which affected her health and well-being.  Id.

The gravamen of D'Anna's complaints was that she believed defendant Walder assigned her to out-of-task duties out of general animus and retaliation towards the nurses' office in response to Eugenio's and Abraham's complaints.  See, e.g., Plaintiffs' Ex. 3, D'Anna Tr. 41:18-42:20; 43:13-45:13.  D'Anna wrote to Piccirella on a Title VI complaint form that she "would like to make a formal complaint against Ms. Walder, on the grounds of being singled out, harassed, and [Walder] stages situations that's [sic] making [D'Anna's] responsibilities impossible to complete."  Plaintiffs' Ex. 22.  She also stated that Ms. Walder retaliated against her for complaining that she was a regular aide, not a special education aide.  Id.

The record before this Court demonstrates that, whether by oral or written complaints, Eugenio's and Abraham's concerns stemmed from their official duty to report suspected child abuse to CPS.  D'Anna's complaints also stemmed from her official duties, namely where she would be stationed at any given time.  Reviewing the "content, form, and context" of plaintiffs' complaints as a whole, plaintiffs' expressions were made in connection with their official duty to report suspected child abuse to CPS. When the plaintiffs reported to Pierorazio, Piccirella, McPartlan, and to their union about their conflict with Walder, they represented that they were concerned about carrying out their job duties.  This is a private concern.  The harassment and animus they felt Walder directed toward them amounted to grievances of an ongoing personal dispute, similar to the Second Circuit's finding that Porr's complaints about his co-teacher Ramracha were of a personal nature.   Accordingly, plaintiffs failed to establish that their expressions

were a matter of public concern.

Distinguishable from plaintiffs' complaints described above is the letter plaintiffs wrote to Pierorazio and forwarded to the Gannett Suburban Newspapers ("Gannett") on April 4, 2006. This letter describes the events giving rise to the present litigation. Plaintiffs' Ex. 39. Although the letter begins with plaintiffs' concerns that the "oppressive and hostile work environment continue[d] unabated" as of the date of the letter, they make clear that they sought external assistance out of concern for the children. Id. at 1, 3. Plaintiffs wrote, "While you and the School District apparently have no interest in protecting children against physical abuse, we do! For that reason, this issue can not [sic] longer be permitted to languish in-house . . . ." Id. at 3. As a result of this letter, the Gannett published an article on April 5, 2006. Plaintiffs' Ex. 53. The article reiterated plaintiffs' concern about the welfare of the children. Id. Plaintiffs' Ex. 53. It stated that the plaintiffs were "appealing for an outside agency such as the Westchester Department of Social Services or District Attorney's Office to investigate" Walder's illegal, alleged interference of CPS calls. Id. As such, it is arguable that plaintiffs' speech was not regarding their official duties. They were not speaking as nurses (or aide) fulfilling their responsibilities to advise their "supervisor about how best to proceed with a pending case." See Garcetti, 547 U.S. at 421.

Assuming, arguendo, that they are afforded First Amendment protection, plaintiffs have not established all the elements of a First Amendment retaliation claim. The record does not establish that plaintiffs suffered adverse employment actions subsequent to the date of the letter. Further, even where plaintiffs allege adverse actions, they have not demonstrated a causal connection between the adverse action

14

and the protected speech.  Morrison, 429 F.3d at 51.  Actionable adverse employment

actions, for the purposes of a First Amendment retaliation claim, must be "'retaliatory

conduct that would deter a similarly situated individual of ordinary firmness from

exercising his or her constitutional rights.'"  Zelnick v. Fashion Inst. of Tech., 464 F.3d

217, 225 (2d Cir. 2006) (citation omitted).  Adverse actions for the purposes of First

Amendment claims include reprimands, "negative evaluation letters, express

accusations of lying," and less desirable work assignments.  Id. at 226 (citations

omitted).  Such determinations are heavily fact-specific and must be more than de

minimis.  Id. (citations omitted).  To establish a causal connection, there "must be

sufficient [evidence] to support the inference that 'the speech played a substantial part

in the employer's adverse employment action.'"  Porr, 2008 WL 4831426, at *2 (citing

Ezekwo v. N.Y. City Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991).

Here, plaintiffs reported to McPartlan, by letter dated June 2, 2006, a "list of

existing behavior demonstrated by Ms. Walder" which they described as a "hostile work

environment."  Plaintiffs' Ex. 40.  Viewing this letter in a light most favorable to plaintiffs,

the Court construes this list to describe events occurring after the Gannett article was

published.  Nonetheless, the list itemizes eight incidents which cannot be described as

more than de minimis.  See id.  As example, the plaintiffs complain of "looks," alleged

unprofessional communication, a one-time incident where an aide could not serve as a

substitute bus monitor, and D'Anna feeling like she had "'cooties.'"  Id.  In viewing the

totality of these facts, the Court cannot find that these few acts would deter a similarly

situated individual of "ordinary firmness" from exercising her constitutional rights.

Next, D'Anna claims that Walder occasionally removed her from the nurses'

15

office in retaliation of the nurses' CPS reporting.  D'Anna claims that assigning her tasks

outside the nurses' office and denying her a stipend in connection with her

reassignments to certain classrooms amounted to retaliatory adverse employment

actions.  First Amended Complaint ¶ 14(d)-(e).  Piccirella originally found, and conveyed

to Pierorazio, that D'Anna did perform "'out of title'" tasks for which she was entitled to a

stipend.  Plaintiffs' Ex. 26.  However, defendants assert that D'Anna's reassignments

were within her job description and thus did not constitute an adverse employment

action.  Defendants' Memo. of Law in Support of their Joint Mot. for Summ. Judgment

against Karen D'Anna at 18-19 [hereinafter "Defendants' Memo. against D'Anna"].

Defendants also assert that D'Anna testified to the same.  Id.; Defendants' in Opp. to

D'Anna Ex. E., D'Anna Tr. 140:2-22.  Nonetheless, defendants contend that even if

D'Anna's contentions are true, she would have been reassigned on these occasions in

response to emergency situations.  Defendants' Memo. against D'Anna at 20-21.

Plaintiffs do not present evidence to the contrary.  Thus, plaintiffs have not established

that retaliation was a substantial or motivating factor in D'Anna's reassignments.

Finally, plaintiffs contend that they have been docked pay and reprimanded for

excessive absences in connection with attending depositions for this matter.  Plaintiffs'

Memo at 21; Plaintiffs' Exs. 45-52.  Plaintiffs also allege that current principal of P.S. 29,

Carol Blakney, changed their duties starting in the 2006-2007 school year, essentially

reducing their autonomy.  Plaintiffs' Memo at 20.  However, plaintiffs have only made

conclusory allegations that the parties responsible for said acts knew about their

protected speech.  Pierorazio is the only named defendant in receipt of the April 4, 2006

letter, but plaintiffs do not allege that he knew about the adverse acts, performed them

16

himself, or even condoned such behavior.  See id.; see, e.g., Plaintiffs' Exs. 45-52 (showing that plaintiffs communicated directly to Blakney regarding being paid for and attending depositions; Franks requested information regarding their depositions; and Piccirella wrote letters to the plaintiffs regarding their absences).  Furthermore, a close temporal proximity cannot be inferred between the said protected speech and these acts.  The acts plaintiffs complained of here occurred anywhere from February 25, 2008 to July 14, 2008, around two years after plaintiffs' letter.  Plaintiffs' Exs. 45-52.  As such, the Court cannot find that plaintiffs' protected speech "played a substantial part" in Blakney's, Franks', and Piccirella's alleged adverse actions.

Thus, plaintiffs have not established a causal connection between their protected speech and the adverse employment actions.  As plaintiff's have not submitted evidence to establish a prima facie case of First Amendment retaliation, it is respectfully recommended that defendants' motions for summary judgment should be granted.


## IV.  TITLE VII CLAIM

Plaintiffs allege that the District violated their rights as guaranteed by Title VII of the Civil Rights Act of 1964 ("Title VII") when defendants Pierorazio, Piccirella, and McPartlan failed to stop Principal Walder from interfering with their mandatory duty to report to CPS when they suspected child abuse of African-American children at P.S. 29. Defendants assert that plaintiffs have failed to state a cause of action because plaintiffs, themselves, were not discriminated against because of their race.  In the alternative, defendants assert that plaintiffs failed to prove that they suffered materially adverse employment actions as a result of the alleged discrimination.

17

Title VII forbids an employer from discriminating against an employee or applicant for employment "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Title VII 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'" Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 382 (2d Cir. 2006) (citing Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). In the absence of direct evidence of discrimination, courts analyze claims brought under Title VII pursuant to the three-step burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). Under the McDonnell-Douglas framework, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was performing his duties satisfactorily; and (4) the circumstances surrounding the employment action give rise to an inference of discrimination. See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).

If the plaintiff establishes his prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of production then shifts to the employer "to articulate some legitimate nondiscriminatory reason" for its actions. See Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc). "The employer's explanation must be clear and specific, so that the employee has an opportunity to demonstrate pretext." Hill v. Taconic Dev. Disabilities Serv. Office, 181 F. Supp. 2d 303, 317 (S.D.N.Y. 2002).

"Should the defendant carry this burden, the plaintiff must then demonstrate that

18

the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993).  In determining whether the plaintiff has met this burden, the court must take a "case-by-case" approach that weighs "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'" James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148-49 (2000)).  In other words, although the burden of production shifts, "the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited [age, gender, race or national origin] discrimination occurred." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quotation and citation omitted).

In the present case, plaintiffs allege overt race discrimination.  They contend that Principal Walder's open policy was to interfere with the mandatory reporting of child abuse of African-American children.  Plaintiffs allege that Principal Walder did not interfere with CPS reports of other children.  Moreover, plaintiffs do not allege that the overt discrimination was directed at them.  In response to defendants' motion for summary judgment, plaintiffs admit that the discrimination they complain of is the discrimination against school children.  Plaintiffs' Memo at 3.  As such, plaintiffs have not submitted direct evidence showing, or indirect evidence giving rise to, an inference of discrimination in violation of Title VII's prohibited employment practices.  Simply stated, plaintiffs have not submitted evidence of discrimination by their employer against them.

Accordingly, no genuine issue of material fact exists in connection with plaintiffs' Title VII claim.  Therefore, it is respectfully recommended that defendants' motions for summary judgment should be granted.

## V.  TITLE VII RETALIATION CLAIM

Plaintiffs allege that the District retaliated against them in violation of Title VII after they filed grievances with the District and complaints with the EEOC alleging that Walder retaliated against them when they reported suspected child abuse of African-American students.  Defendants argue that plaintiffs experienced no materially adverse employment actions and, therefore, such claim should fail.  Defendants further claim that D'Anna failed to establish a causal connection between the alleged protected activity and any adverse act.  Defendants concede that Abraham engaged in protected activity when she filed her grievance and EEOC complaint.[5]  However, although defendants have made this concession as to Abraham, there are no factual differences between her claims and those of Eugenio.  Accordingly, the same analysis applies.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

---

[5] The Court notes that defendants originally conceded that D'Anna engaged in a protected activity, but later changed their position.  Defendants' Memo. of Law in Reply to D'Anna's Opp. to Defendants' Mot. for Summary Judgment at 8.

In order to establish a prima facie case of retaliation, plaintiff must show that (1) she was engaged in a protected activity, (2) school district was aware of that activity, (3) she suffered an adverse employment action and (4) there was a causal connection between the protected activity and the adverse employment action.  See Gregory v. Daly, 243 F.3d 687,700 (2d Cir. 2001).

If a plaintiff establishes her prima facie case of retaliation, defendant must then offer "a legitimate, non-discriminatory reason for the adverse action."  Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001).  Once defendant proffers this reason, plaintiff must then show that the proffered reason is pretextual.  See id.

With regards to the first prong of a plaintiff's prima facie case of retaliation ("protected activity"), a plaintiff "need not prove that the conditions against which he protested actually amounted to a violation of Title VII."  Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999) (citation omitted).  A plaintiff "must demonstrate only that he had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'"  Id. (quoting Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).  Nonetheless, the acts giving rise to plaintiff's complaints must refer to "an unlawful *employment practice* of his employer."  Id. at 135 (emphasis in the original) (quoting Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978).  Accordingly, a plaintiff cannot reasonably believe, or have a good faith belief, that she was opposing an employment practice when "the evidence does not address racial discrimination in an employment practice."  Id. at 135-36 (citations omitted).

Case law demonstrates that "acts against private individuals, who are not in an

employment relationship with the person complained about, are not within the area of unlawful employment practices prohibited by Title VII." Kunzler v. Canon, USA, Inc., 257 F. Supp. 2d 574, 579-80 (E.D.N.Y. 2003).  For example, in Wimmer v. Suffolk County Police Dep't, the plaintiff police officer made a complaint that his department racially discriminated against the general public.  176 F.3d at 135-36.  The Second Circuit held that he did not have a good faith, reasonable belief that the underlying discrimination violated Title VII.  Id.  The court held that because the racially discriminatory acts were not directed at the plaintiff or one of his co-employees, the discrimination was not a form of employment discrimination.  Id. at 135.  Accordingly, even if the officer's claims were true, he could not have believed, reasonably or in good faith, that such discrimination was unlawful employment discrimination actionable under Title VII.  Id. at 136.

In a later Second Circuit decision, the court clarified in what types of employment relationships a plaintiff could have a "good faith, reasonable belief" that the underlying discrimination fell under Title VII.  In McMenemy v. City of Rochester, plaintiff, a city firefighter, investigated a complaint that a fellow firefighter, who was also the local firefighters' union president, sexually harassed and assaulted the firefighters' union's secretary, Wendy Kern.  241 F.3d 279, 281 (2d Cir. 2001).  Because Kern was not the city's employee, the district court held that plaintiff did not base his complaint on a "protected activity" under Title VII, and thus granted defendants' motion for summary judgment.  Id.

On appeal, the Second Circuit vacated said decision and explained that acts giving rise to retaliation need not have been conducted by current employees;

22

specifically that Title VII retaliation claims were actionable when the underlying discrimination and reporting occurred at previous employment, yet the current employer retaliated.  Id. at 284 (citing Johnson v. Palma, 931 F.2d 203, 208 (2d Cir. 1991)).  It further decided that a plaintiff stated an actionable claim where "two employers have a relationship that may give one of them an incentive to retaliate for an employee's protected activities against the other," e.g., where a union retaliated against one of its member for filing a race discrimination claim against his actual employer.  Id. at 284 (citing Christopher v. Stouder Memorial Hosp., 936 F.2d 870, 873-74 (6th Cir. 1991)).

Thus, the court clarified in McMenemy that "the plaintiff's claim in Wimmer failed because the plaintiff's activities were directed at the behavior of co-employees toward third parties and were unrelated to an employment practice made illegal by Title VII."  Id. at 283.  In McMenemy, however, the employee (McMenemy) complained of the behavior of a co-employee (who was also the union president) toward a union employee.  Id. at 281.  The special relationship between the union and the city (McMenemy's employer and alleged retaliator) raised a factual issue as to whether the union "performed 'any traditional employee duties' and should therefore be counted as employees" of the city.  Id. at 285 (quoting Kern v. City of Rochester, 93 F.3d 38, 47 (2d Cir. 1996)).   The court held that under "these circumstances, McMenemy's belief that Kern's sexual harassment violated Title VII was reasonable."  Id.

Following said analysis, in the present case, plaintiffs could not have had a good faith, reasonable belief that the underlying discrimination of which they complained was a protected activity under Title VII.  They do not contend that they or their co-employees were discriminated against because of their "race, color, religion, sex, or national origin."

23

42 U.S.C. § 2000-e2(a).  Plaintiffs complained that Walder discriminated against third-party individuals, African-American children at P.S. 29.  Plaintiffs have not asserted that the school children perform any traditional employee duties for the District.  Therefore the Court cannot find that the children are in an employment or employment-like relationship.  Nor do the children work for an employer that has a special relationship with the school district, such as a union would with its members' employer.  Plaintiffs' also do not claim that the underlying discrimination took place in a prior employment relationship.  As such, even if Walder discriminated against these children because of their race, such discrimination is not an unlawful employment practice prohibited by Title VII.

To the extent that plaintiffs' claims rest on retaliation for filing their EEOC complaints on May 2, 2006, plaintiffs have not established that they suffered materially adverse employment actions caused by their EEOC filings.  To establish that an employer's conduct constituted an adverse employment action under (2) above, a plaintiff must show that the conduct resulted in a "materially adverse change in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  Examples of actions that would be considered materially adverse include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  On the other hand, "not everything that makes an employee unhappy is an adverse employment action."  Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002).  Reprimands and close monitoring are not adverse employment actions under Title VII.  See Castro v. New York City Bd. of Educ. Pers.,

No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998).  Nor does a scheduling change contrary to an employee's wishes constitute an adverse employment action.  See DeMars v. O'Flynn, 278 F. Supp. 2d 230, 245-46 (W.D.N.Y. 2003).  Nor does being precluded from working on a particular day constitute an adverse employment action.  See Phillips, 278 F.3d at 117.  Also, a supervisor's "occasional nastiness" does not constitute an adverse employment action. See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 n.3 (2d Cir. 1996).  To prove a causal connection, a plaintiff may submit either direct evidence of retaliatory animus, or indirect evidence showing that the protected activity was closely followed in time by the adverse action.  See Sumner v. United States Postal Serv. 899 F.2d 203, 209 (2d Cir. 1990).

As discussed above, plaintiffs have not submitted evidence that adverse employment actions occurred in connection with their protected speech.  Here, plaintiffs submit the same evidence as they did for their First Amendment Retaliation claims to show that they suffered adverse actions for filing their EEOC complaints.  The result is the same: to the extent that plaintiffs' docked pay and reprimands for absences in connection with attending depositions amount to adverse employment actions, plaintiffs have not submitted more than conclusory evidence that said actions were a result of their EEOC complaints.  These actions occurred almost, if not more than, two years after they filed said complaints.  Plaintiffs' Ex. 45-52.  Accordingly, plaintiffs have not established a causal connection between the adverse actions and their EEOC complaints.

Because plaintiffs have not submitted evidence to establish two of the elements for their Title VII retaliation claim, it is respectfully recommended that defendants'

motions for summary judgment should be granted.

## VI.  NEW YORK HUMAN RIGHTS LAW CLAIM

Plaintiffs allege that the District, and individual defendants as aiders and abettors, retaliated against them in violation of New York's Human Rights Law ("NYHRL") when they complained of Principal Walder's alleged race discrimination against African American children.  Defendants argue that plaintiffs' claims fail here because no underlying protected activity occurred and plaintiffs experienced no materially adverse employment actions.  Defendants also argue that Abraham's and D'Anna's claims fail under NYHRL's aid and abet prohibition because there is no predicate violation or protected activity on which to base said claim.[6]

NYHRL makes it unlawful practice for an employer to discriminate against individual employment applicants and employees on the basis of "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status."  N.Y. Exec. Law § 296(1)(a).  NYHRL forbids employers from retaliating against its employees in connection with those unlawful practices, making it unlawful "[f]or any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under" NYHRL or "because he or she has filed a complaint, testified or assisted in any proceeding under" NYHRL.  Id. § 296(1)(e).  Employment discrimination

---

[6] Although defendants do not make the same assertion in connection with Eugenio, there are no factual differences among the events giving rise to her aid and abet claim as for those events in connection with Abraham's and D'Anna's claims. Accordingly, the same analysis applies.

claims under NYHRL follow the same analysis as for Title VII claims.  Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) (citations omitted).

Unlike Title VII, however, individuals may be sued as employers for violations of NYHRL if they have ownership interests in the hiring company or do more than carry out personnel decisions of others.  Ahmed v. Compass Group, No. 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. Aug. 3, 2000) (citing Patrowich v. Chem. Bank, 473 N.E.2d 11, 12 (N.Y. 1984)).  However, simply because an employee "has a title as an officer and is the manager or supervisor of a corporate division," such employee is not automatically "individually subject to suit with respect to discrimination" under NYHRL.  Patrowich v. Chem. Bank, 473 N.E.2d 11, 12 (N.Y. 1984).

In the alternative, individuals also can be held liable for violations of NYHRL if they aided and abetted the unlawful discrimination.  The law states: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).  Additionally, under § 296(6), the individual "who actually participates in the conduct giving rise to a discrimination claim" can also be held personally liable. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998).

As discussed above, plaintiffs did not submit evidence that they suffered discrimination as a result of prohibited employment practices under Title VII.  Plaintiffs also failed to submit evidence that they were engaged in a protected activity giving rise to unlawful employment discrimination actionable under a Title VII retaliation claim. Therefore, plaintiffs were unable to establish prima facie cases of Title VII violations or

retaliation.  Because NYHRL violations and retaliation claims follow the same analysis, plaintiffs also fail to establish prima facie cases here.  Furthermore, absent a predicate claim of a violation of NYHRL, defendants cannot be liable for unlawful aiding and abetting.  See Murphy v. ERA United Realty, 674 N.Y.S.2d 415, 417 (App. Div. 1998) ("the discriminatory practice . . . serves as the predicate for the imposition of liability on others for aiding and abetting").

Thus, it is respectfully recommended that defendants' motions for summary judgment as to plaintiffs' NYHRL claims should be granted.


## VII.  42 U.S.C. § 1981 CLAIM

Plaintiffs allege that defendants retaliated against them in violation of 42 U.S.C. § 1981 when they complained of Principal Walder's alleged race discrimination against African-American children.  Defendants assert that plaintiffs did not suffer materially adverse employment actions in connection with any alleged § 1981 retaliation.  Further, defendants also claim that D'Anna was not engaged in a protected activity giving rise to a § 1981 retaliation claim.[7]

42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  § 1981(a).  The statute defines the phrase "make and

---

[7] Defendants also disputed any claims plaintiffs asserted in connection with race discrimination directed towards them in violation of § 1981.  However, plaintiffs concede that they do not assert such claims.  Accordingly, this Court does not review said arguments.

enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). Section 1981 encompasses claims of retaliation. CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951, 1961 (2008). Specifically, § 1981 forbids "retaliation against a person who has complained about a violation of another person's *contract-related* 'right.'" Id. at 1954 (emphasis added). To establish a prima facie case of retaliation under § 1981, a plaintiff must follow the same elements and burdens of proof for Title VII retaliation claims as described above. Choudhury v. Polytechnic Inst. of N.Y., 735 F.2d 38, 44 (2d Cir. 1984).

Thus, in the present case, plaintiffs must submit evidence that they had a reasonable, good faith belief that they complained of actionable discrimination under § 1981, namely that defendants discriminated against the African-American students in connection with a contract right. Plaintiffs do not assert that the students and the defendants had an employee/employer relationship giving rise to such a contract-related right. Furthermore, plaintiffs offer no other basis whereby the students would have a contract-related right deriving from their relationship with defendants. Therefore, plaintiffs failed to submit evidence to establish a necessary element of their § 1981 claim. Thus, it is respectfully recommended that defendants' motions for summary judgment as to plaintiffs' § 1981 claim should be granted.

## VIII.  EQUAL PROTECTION CLAIM

Plaintiffs raise a third-party standing Equal Protection claim, alleging that defendants violated the Fourteenth Amendment for discriminating against the African-

29

American children at P.S. 29 and retaliating against plaintiffs when they complained of the alleged discrimination.  Defendants contend that Eugenio has no third-party standing as to the rights of the African-American children because she has not sustained an "injury in fact" in connection with the alleged discrimination, she is not closely related to the African-American children, and there are no facts to substantiate that the African-American children are hindered in protecting their own rights.

A plaintiff may bring actions on behalf of third parties where: (1) the plaintiff "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute;" (2) the plaintiff has "a close relation to the third party;" and (3) the third parties are hindered in their ability to protect their own interests. Powers v. Ohio, 499 U.S. 400, 410-411 (1991) (citations omitted); De Jesus-Keolamphu v. Vill. of Pelham Manor, 999 F.Supp. 556, 567 (S.D.N.Y. 1998) (citations omitted).

Plaintiffs do not contest defendants' contentions as stated above in connection with Eugenio's Equal Protection claim.  Furthermore, although defendants did not contest Abraham's and D'Anna's Equal Protection claims, the same analysis applies. Plaintiffs have not submitted evidence that (1) either Abraham or D'Anna sustained "injury in fact" in connection with the alleged violation of the children's rights; (2) they are closely related to the children; and (3) the children are hindered in protecting their own rights.  As such, plaintiffs failed to establish the essential elements of a third-party standing Equal Protection claim.  Therefore, it is respectfully recommended that defendants' motions for summary judgment should be granted.


IX.  CONCLUSION

30

For all of the foregoing reasons, I conclude, and respectfully recommend that defendants' motions for summary judgment should be GRANTED in entirety.

## X.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(B), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days from receipt of this Report  to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have thirteen (13) days from receipt of this Report to file and serve written objections.  See Fed. R. Civ. P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.

Dated:   March ___, 2009                    Respectfully Submitted:

White Plains, New York

GEORGE A. YANTHIS, U.S.M.J.