UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LILLIAN EUGENIO, RUBY ABRAHAM, KAREN
D'ANNA, and GWENDOLYN SHERMAN,


                                    Plaintiffs,                          06-CV-4928 (CS) (GAY)

                                                                    **MEMORANDUM DECISION**
                  - against -                                       **AND ORDER ADOPTING IN**
                                                                    **PART AND MODIFYING**
MARILYN WALDER, BERNARD P. PIERORAZIO,                              **REPORT AND**
VINCENT A. McPARTLAN, PASQUALE PICCIRELLA,                         **RECOMMENDATION**
and the YONKERS CITY SCHOOL DISTRICT,



                                    Defendants.
------------------------------------------------------------------------x

Appearances:

Jonathan Lovett, Esq.
Law Offices of Jonathan Lovett
White Plains, New York
*Counsel for Plaintiffs*

Vincent P. D'Andrea, Esq.
Donoghue, Thomas, Auslander & Drohan
Scarsdale, New York
*Counsel for Defendants Pierorazio, McPartlan, Piccirella and Yonkers City School District*

Joan M. Gilbride, Esq.
Kaufman, Borgeest & Ryan, LLP
New York, New York
*Counsel for Defendant Walder*

Seibel, J.

        Before the Court is the Report and Recommendation ("Report") of Magistrate Judge

George A. Yanthis (Doc. 59), recommending that Defendants' Motions for Summary Judgment

(Docs. 28, 32, 34, 37) be granted.

**I. Background**

    **A.  The Parties**

    Plaintiff Lillian Eugenio, a Caucasian female, is employed by the Yonkers City School District (the "District") and has worked as a Licensed Practical Nurse at Public School 29 ("P.S. 29") for twenty-two years.  (Eugenio's Rule 56.1 Statement ¶¶ 1, 8.)  Plaintiff Ruby Abraham, a female of Asian national origin, is also employed by the District and has worked as a Registered Professional Nurse at P.S. 29 for six years.  (Abraham's Rule 56.1 Statement ¶¶ 1, 3.)  Plaintiff Karen D'Anna, a Caucasian female, is employed by the District and has worked as a School Aide at P.S. 29 for over fifteen years.[1]  (D'Anna's Rule 56.1 Statement ¶¶ 1, 3-4.)  During the relevant period, Plaintiffs worked together in the Nurse's Office at P.S. 29.  Plaintiffs Eugenio and Abraham are mandated reporters of suspected child abuse pursuant to New York State law (Eugenio's Rule 56.1 Statement ¶ 12), and Plaintiff D'Anna is not (D'Anna's Rule 56.1 Statement ¶ 7).

    Defendant Marilyn Walder, an African-American female, was the Principal of P.S. 29 from 1991 until June 6, 2006, and as such, was also a mandated reporter of suspected child abuse pursuant to New York State law.  (*Id.* ¶ 2.)  Defendant Bernard P. Pierorazio, a Caucasian male, is the Superintendent of Schools for the District.  (Eugenio's Rule 56.1 Statement ¶ 2.)  Defendant Vincent A. McPartlan, a Caucasian male, is the District's Executive Director of Pupil Support Services and Special Education.  (*Id.* ¶ 3.)  Defendant Pasquale Piccirella, a Caucasian

---

[1]  The Amended Complaint originally included another Plaintiff, Gwendolyn Sherman. On August 20, 2008, however, the Parties stipulated to the discontinuance with prejudice of her claims.  (Doc. 50.)

male, is the Director of District Safety and Security as well as the District's Title VI and Title IX

Compliance Officer.  (*Id.* ¶ 4.)

### B.  Factual Background

Plaintiffs filed an Amended Complaint on July 6, 2006 (Doc. 3), alleging that Walder

repeatedly and consistently opposed their reports of suspected child abuse to Child Protective

Services ("CPS") when those reports were made with respect to African-American children,

because Walder allegedly believes that such reports are "destructive of the social fabric of

African-American families and adversely impact[] the parents and/or guardians of abused

children . . . ."  (Am. Compl. ¶ 13.)  Pursuant to New York State law, the first mandated reporter

to suspect child abuse must report it to CPS,[2] but Plaintiffs allege that Walder had a policy

requiring Plaintiffs to notify Walder of such suspected abuse *before* reporting it to CPS.[3]

(Eugenio Dep. 117, 152; Abraham Dep. 124-29; D'Anna Dep. 185-86.)  Plaintiffs also contend

that Walder discouraged and took punitive and retaliatory actions against them for their

---

[2]  Pursuant to New York Social Services Law Section 413, certain designated "persons and officials are required to report or cause a report to be made . . . when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child . . . ."  N.Y. Soc. Servs. Law § 413(a).  Further, New York State law provides that "[w]henever such person is required to report . . . in his or her capacity as a member of the staff of a medical or other public or private institution, school, facility or agency, he or she shall make the report . . . and immediately notify the person in charge of such institution, school, facility or agency . . . .  Such person in charge . . . shall be responsible for all subsequent administration necessitated by the report."  *Id.* § 413(b).

[3]  The District's Policy Manual dated May 8, 2007, states that "[p]ursuant to applicable law, any school official or employee who has a reasonable cause to know or suspect that a child has been subjected to abuse or maltreatment will immediately report this to the building principal, who will report the case to New York State Child Abuse and Maltreatment Register as required by law."  (Pierorazio Dep. 43.)  Mr. Pierorazio testified, however, that this policy, which does not differentiate between mandated reporters and other employees, is not the procedure followed in the District.  (*Id.* 44.)

persistence in making such reports.  (Am. Compl. ¶ 14.)  Specifically, Plaintiffs assert that

Walder has taken adverse actions against them including:  forbidding them to report suspected

child abuse, punitively reassigning them to different positions, removing necessary equipment

from the nurse's office, disclosing their identities to parents of children with respect to whom

they have reported suspected abuse, subjecting them to verbal abuse, and treating them in a

degrading manner.  (*Id.*)  The Amended Complaint further alleges that Walder harbored animus

against, and engaged in misconduct with respect to, learning disabled and developmentally

disabled children.  (*Id.* ¶ 7.)

      At different times from 2002 to 2006, Plaintiffs expressed concerns regarding Walder's

alleged misconduct to District administrators, including Defendants Pierorazio, McPartlan and

Piccirella.  On October 31, 2002, Eugenio met with Dr. Cordero, the Chief School Physician, and

discussed with him her complaints regarding Walder's alleged harassment and intimidation of

Plaintiffs.  (Abraham Dep. 254.)  On November 4, 2002, Abraham sent a letter regarding

Walder's alleged mistreatment of Plaintiffs to Sue LaDue, the District's Harassment Officer and

Assistant Superintendent at the time.  (Gould Aff. Ex. 9.)

      In 2005, Plaintiffs sought the intervention of the Civil Service Employees Association

("CSEA"), their certified labor union and collective bargaining unit.  (*See id.* Ex. 14.)  The

CSEA president, Bobbie DiBattista, and a CSEA representative, Lawrence Sparber, met with

Plaintiffs on September 21, 2005, to discuss Plaintiffs' complaints that Walder was harassing,

threatening and interfering with Plaintiffs' performance of their professional duties.  (Sparber

Dep. 17-23.)  Thereafter, DiBattista and Sparber contacted Superintendent Pierorazio to set up a

meeting to discuss  Plaintiffs' concerns.  On September 28, 2005, DiBattista and Sparber met

with Pierorazio to discuss Plaintiffs' complaints.  During that meeting, Pierorazio said the he

would look into the matter as well as meet with Plaintiffs.  (DiBattista Dep. 24-26.)

On November 3, 2005, Eugenio, D'Anna and Abraham, accompanied by their union

representatives, DiBattista and Sparber, met with Pierorazio to discuss their complaints.

(Eugenio's Rule 56.1 Statement ¶ 19; Eugenio Dep. 391-93; Pierorazio Dep. 6; Sparber Dep.

23.)  At the meeting, Plaintiffs contend that they expressed their complaints regarding Walder,

including her alleged discrimination against African-American children by preventing mandated

reporters from calling CPS, her harassment of Plaintiffs, as well as her interference with their

professional duties.  (Eugenio Dep. 527-28; Sparber Dep. 25-26.)  According to Eugenio,

Pierorazio told Plaintiffs at this meeting that when child abuse is suspected and a call to CPS is

to be made, informing the principal is a courtesy intended to prepare the principal for CPS's

arrival at the school.  (Eugenio Rule 56.1 Statement ¶ 18; Eugenio Dep. 128.)  Eugenio testified

that she understood this statement as a "directive" that she report suspected child abuse to the

principal before reporting it to CPS.  (Eugenio Dep. 130-31.)

On November 9, 2005, Eugenio and Abraham filed grievances on Title VI[4] forms

claiming that they were being discriminated against, harassed, slandered and singled out because

they followed District policy and New York State law.  They complained that Walder was

jeopardizing their ability to do their jobs, and that she was making their workplace "stressful"

---

[4]  Title VI, 42 U.S.C §§ 2000d - 2000d-7, which was enacted as part of Civil Rights Act
of 1964, prohibits discrimination on the basis of race, color, and national origin in programs and
activities receiving federal financial assistance.  *See* 42 U.S.C. § 2000d ("No person in the
United States shall, on the ground of race, color, or national origin, be excluded from
participation in, be denied the benefits of, or be subjected to discrimination under any program
or activity receiving Federal financial assistance.").

and "hostile."  (Gould Aff. Exs. 20, 22.)  D'Anna also filed a grievance on a Title VI form on

November 9, 2005, claiming that Walder was taking retaliatory actions against her, including

harassing her and requiring her to perform out-of-title tasks because she filed grievances in June

2005.[5]  (Id. Ex. 21.)  On the basis of these complaints, Pierorazio directed Piccirella to conduct

an investigation of Plaintiffs' grievances, which Piccirella did by interviewing each Plaintiff

separately.  (Pierorazio Dep. 16; Eugenio's Rule 56.1 Statement ¶ 23; Abraham's Rule 56.1

Statement ¶ 15.)

On November 30, 2005, Piccirella issued a written report to Pierorazio regarding Eugenio

and Abraham's complaints.  The report concluded that the "work environment at School 29 for

the complainant's [sic] is uncomfortable," but that "[t]here is no indication the treatment of

either complainant is based on race, color, national origin, religion or gender.  Therefore, a

violation of Title VI has not been established."  (Gould Aff. Ex. 27.)  On November 29, 2005,

Piccirella issued a memorandum regarding his findings with respect to D'Anna's grievance.  He

concluded that the "work environment at School 29 for the complainant is uncomfortable" and

that D'Anna had "completed 'out of title' tasks," which entitled D'Anna to a stipend that she had

not been given.  As with the other grievances, Piccirella concluded that there was no indication

---

[5]  D'Anna filed grievances on June 2 and 3, 2005.  She claimed that Walder improperly
assigned her to positions outside of the nurse's office.  Specifically, D'Anna complained that
Walder assigned her to serve as a one-on-one aide to a special education student, despite the fact
that she had informed Walder that she did not believe that she could properly do the job, and that
she did not receive the special education stipend, which was paid to aides performing special
education-related duties.  In addition, she complained that she was not permitted to take a lunch
break on several occasions and that Walder spoke to her in a "rude and intimidating manner."
(Gould Aff. Ex. 10.)  By letters dated June 7 and 8, 2005, the president of the CSEA was
informed that D'Anna's grievances were denied because the District determined that she was
permitted to take lunch breaks and was not reassigned as a School Aide-Special Education.  (Id.)

of discrimination and, therefore, no violation of Title VI.  Piccirella recommended, however, that "[f]urther inquiry . . . be conducted by a supervisor from Pupil Support Services and Elementary Education in an attempt to resolve the work environment and stipend payment."  (*Id.* Ex. 26.)

On December 1, 2005, Pierorazio issued a memorandum to McPartlan and Sharon Woods, then the Executive Director of Elementary Instruction for the District, informing them the Piccirella found that there was "no violation of Title VI," but that the "recommendation indicates intervention by the Supervisor of Pupil Support Services and Elementary Education to resolve the 'hostile work environment.'"  (*Id.* Ex. 28.)  Although Pierorazio testified that he directed McPartlan and Woods to take action regarding the situation (Pierorazio Dep. 26), Plaintiffs maintain that no remedial actions were taken (Am. Compl. ¶¶ 15-16).  Sparber of the CSEA wrote a letter to Pierorazio dated January 17, 2006, requesting an update regarding the District's action plan with respect to Plaintiffs' complaints and a meeting with Pierorazio to discuss the outstanding issues.  (Gould Aff. Ex. 30.)  Sparber wrote to Pierorazio again on February 9, 2006, seeking a response to his January 17, 2006 letter and urging Pierorazio "to pursue immediate corrective action on this issue."  (*Id.* Ex. 31.)

On February 14, 2006, McPartlan and Woods visited P.S. 29 and met with Plaintiffs to investigate their complaints.  (McPartlan Dep. 40-43; Gould Aff. Ex. 36.)  The following day, McPartlan and Woods met with Walder and her union representative.  (McPartlan Dep. 56.)  McPartlan and Woods issued a memorandum to Pierorazio on February 15, 2006, regarding their investigation and setting forth the proper procedures to be followed with respect to 911 emergencies and suspected child abuse.  (Gould Aff. Ex. 36.)  They found that there was "a miscommunication of procedures that should be followed as it pertains to CPS cases and 911

-7-

emergency cases," and that "professional medical personnel should be allowed to use their

professional judgment as it pertains to 911 emergencies, as well as CPS cases."  (*Id.*)  The

memorandum also indicated that D'Anna "ha[d] been used for out-of-title duties on an ongoing

basis," and recommended that procedures be put in place, including making every effort not to

re-assign designated nurse's aides to other tasks unless warranted by an emergency situation,

using designated special education aides to assist special education children, and preventing the

use of retaliation or intimidation tactics against any party as a result of a complaint.  (*Id.*)

On February 16, 2006, McPartlan sent letters to Eugenio, Abraham and D'Anna, copying

Pierorazio, Woods, Walder and Cordero, regarding Plaintiffs' concerns and the February 14,

2006 meeting.  The letters stated that Plaintiffs' medical professionalism and opinions should not

be compromised, and detailed the procedures to be followed in cases of suspected child abuse.

(*Id.* Exs. 33-35.)  In addition, McPartlan clarified D'Anna's "role and responsibility as a School

Aide at School 29" by advising her that she had been "officially assigned to the School 29

Nurses' Office to assist with their day-to-day operation since the additional special education

students were brought back to the District."  Further, he recommended that she only be

reassigned from her responsibilities in emergency situations, which arise from time to time in a

school with a large special education population.  (*Id.* Ex. 33.)  During his deposition, however,

McPartlan testified that his finding regarding D'Anna's out-of-title duties was mistaken because,

as he later discovered, school aides could not be officially assigned to the nurse's office and the

District had never had a nurse's aide title.[6]  (McPartlan Dep. 67-68.)  Thus, while D'Anna

---

[6]  McPartlan further testified that he felt that he did not need to correct the report because
D'Anna had complained not only about being assigned to special education aide duties, but
being required to work in the main office as well.  (McPartlan Dep. 69.)

believed that she was a nurse's aide, no such title existed, and she was at all relevant times a school aide.  (D'Anna Dep. 38-39.)

Woods sent a letter to Walder on February 22, 2006, explaining that permission was not required to make either 911 calls or CPS reports, but that the building administrator should be notified.  Woods also advised Walder that she should "make every effort to use school personnel in their designated titles and not reassign the designated nurse's aide to other tasks unless it is warranted under an emergency situation."  Finally, Woods cautioned Walder that "[i]nterference with these directives is cause for disciplinary action against [her]."  (Gould Aff. Ex. 37.)  Walder responded to Woods's letter on April 7, 2006, reiterating that D'Anna is a School Aide, rather than a "Nurse Aide," that Walder allowed D'Anna to work out-of-title due to Walder's concern for the students, and that Walder would only reassign D'Anna "in order to meet [her students'] daily concerns."  (Gilbride Aff. Ex. P.)  D'Anna testified at her deposition that she believes that Walder took retaliatory actions against her because D'Anna, when she was given special education duties, told Walder that she was not a special education aide.  (D'Anna Dep. 147-48.)

Plaintiffs allege that in the spring of 2006, the CSEA president informed Plaintiffs that the CSEA would not assist Plaintiffs because Pierorazio had requested that they not.  (Am. Compl. ¶¶ 18-20; Abraham Dep. 588-89.)  Plaintiffs wrote a letter dated April 4, 2006, to Pierorazio, copying the Gannett Suburban Newspapers, the Board of Education, the District Attorney, the Commissioner of Social Services and the County Executive, in which they expressed their discontent with Walder's policy of requiring Plaintiffs to notify her before reporting any suspected abuse to CPS and Walder's disapproval of and retaliation against Plaintiffs for persisting in reporting suspected child abuse to CPS.  (Gould Aff. Ex. 39.)  On

April 4, 2006, DiBattista left a voicemail message on D'Anna's cell phone advising her not to go to the press because doing so would cause people to lose their jobs.  On April 5, 2006, the *Journal News* published an article entitled "Principal Accused of Stifling Abuse Reports." (Gould Aff. Ex. 53.)  Thereafter, Plaintiffs allege Defendants subjected them to retaliatory treatment and that as a result thereof, they ceased expressing their concerns regarding the health and safety of children at P.S. 29.  (Am. Compl. ¶ 21.)  In addition, they allege that they have been retaliated against in numerous ways following the filing of this action.

Plaintiffs assert claims against all of the Defendants for First Amendment retaliation and violation of their equal protection rights pursuant to 42 U.S.C. § 1983, racial discrimination pursuant to 42 U.S.C. § 1981, and violation of the New York State Human Rights Law.  (*Id.* ¶¶ 30-41.)  In addition, Plaintiffs assert against the District claims for retaliation and discrimination pursuant to Title VII and 42 U.S.C. § 1981.  (*Id.* ¶¶ 42-45.)

The Parties conducted discovery, and on June 20, 2009, Defendants filed separate Motions for Summary Judgment as to each Plaintiff's claims (Docs. 28, 32, 34, 37) on the grounds that Plaintiffs failed to raise material issues of as to:  (1) their First Amendment retaliation claims because their speech – reporting suspected child abuse cases – is not constitutionally protected; (2) their equal protection claims because they lack third party standing; (3) their Title VII, Section 1981 and First Amendment retaliation claims because they did not suffer adverse employment actions; (4) their Title VII, Section 1981 and New York State Human Rights Law claims because they admitted that Defendants did not discriminate against them on the basis of their race; and (5) their Section 1985 claim because they did not demonstrate the existence of a conspiracy.

-10-

On March 2, 2009, Magistrate Judge Yanthis issued the Report recommending that
Defendants' Motions for Summary Judgment be granted.  Plaintiffs filed Objections to the
Report on March 18, 2009, specifically objecting to those portions of the Report recommending
dismissal of their First Amendment and Section 1981 retaliation claims.  (Doc. 60.)  On March
31, 2009, Defendants filed a Response to Plaintiffs' Objections.  (Doc. 61.)

**II. Discussion**

    **A. Standards of Review**

        **1.  Standard for Reviewing a Magistrate Judge's Report and Recommendation**

A district court reviewing a magistrate judge's report and recommendation "may accept,
reject, or modify, in whole or in part, the findings or recommendations made by the magistrate
judge."  28 U.S.C. § 636(b)(1)(C).  Parties may raise objections to the magistrate judge's report
and recommendation, but they must be "specific[,] written," and submitted "[w]ithin 10 days
after being served with a copy of the recommended disposition."  Fed. R. Civ. P. 72(b)(2);
*accord* 28 U.S.C. § 636(b)(1)(C).

Insofar as a report and recommendation deals with a dispositive motion, a district court
must conduct a *de novo* review of those portions of the report or specified proposed findings or
recommendations to which timely objections are made.  28 U.S.C. § 636(b)(1)(C); *see* Fed. R.
Civ. P. 72(b)(3) ("The district judge may accept, reject, or modify the recommended disposition;
receive further evidence; or return the matter to the magistrate judge with instructions.").  The
district court may adopt those portions of a report and recommendation to which no timely
objections have been made, provided no clear error is apparent from the face of the record.
*Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008); *Nelson v. Smith*, 618 F. Supp. 1186,

1189 (S.D.N.Y. 1985); Fed. R. Civ. P. 72 advisory committee's note (b).

### 2.  Summary Judgment Standards

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  On a motion for summary judgment, courts "must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  *McDay v. Travis*, 303 F. App'x 928, 929 (2d Cir. 2008).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to present evidence sufficient to satisfy every element of the claim. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set forth specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e); see *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

### B.  First Amendment Retaliation

Magistrate Judge Yanthis recommended that Defendants' Motions for Summary Judgment be granted as to Plaintiffs' First Amendment retaliation claims.  He found that their

speech – apart from the April 4, 2006 letter copied to the Gannett Suburban Newspapers – was not constitutionally protected because it stemmed from their official duty to report suspected child abuse to CPS, and in the case of D'Anna, from her assignments within P.S. 29.  Moreover, Judge Yanthis found that even if Plaintiffs' speech was constitutionally protected, they did not suffer adverse employment actions and failed to establish a causal connection between their speech and the complained-of actions.  (Report 13-17.)  Plaintiffs object to the Report, arguing that they engaged in First Amendment protected speech, that they suffered adverse employment actions as a result, and that there was a causal connection between the two.

"[A] plaintiff making a First Amendment retaliation claim under § 1983 must . . . demonstrate . . . that:  (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination."  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999); *accord Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).  If these three factors are established, "the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Morris*, 196 F.3d at 110 (internal quotation marks omitted).

### 1.  Protected Speech

To determine whether public employee speech is protected from retaliation under the First Amendment, the court must consider: (1) "'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"

*Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  "[T]he First Amendment does not prohibit managerial discipline based on an employee's expression[] made pursuant to official responsibilities," *Garcetti*, 547 U.S. at 424, because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen[, but rather] . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created," *id.* at 422-23.  "[P]ublic employees who convey complaints or grievances about a matter pertaining to their official duties to their supervisors do so in their capacities as employees rather than citizens, even when the subject matter of their speech touches upon a matter of public concern," and, therefore, such speech is not First Amendment protected.  *Weintraub v. Bd. of Educ. of the City of N.Y.*, 489 F. Supp. 2d 209, 221 (E.D.N.Y. 2007); *accord Kelly v. City of Mount Vernon*, 344 F. Supp. 2d 395, 402 (S.D.N.Y. 2004) (employee expression is not a matter of public concern when it "relates primarily to matters of personal interest or internal office affairs").  Whether speech is a matter of public concern is a question of law for the court, and must be determined by the content, form and context of the speech as revealed by the whole record.  *Singh*, 524 F.3d at 372; *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005).

     The speech that Plaintiffs allege is protected by the First Amendment can be summarized as follows:  (1) reporting suspected child abuse to CPS and making 911 emergency calls; (2) expressing concern to District administrators and CSEA representatives regarding Walder's discrimination against African-American children by preventing Plaintiffs from or retaliating against them for reporting suspected abuse to CPS and calling 911; (3) expressing concern to

-14-

District administrators and CSEA representatives regarding Walder's harassment of Plaintiffs and interference with and hindrance of their other professional duties; and (4) expressing concern to the press and authorities outside the District regarding Walder's policy of requiring mandated reporters to inform her before reporting suspected abuse to CPS, her disapproval of and retaliation against Plaintiffs for making such reports, and the other Defendants' condoning Walder's alleged misconduct.

Plaintiffs' reports of suspected abuse to CPS are not constitutionally protected speech because Plaintiffs made those reports pursuant to their official duties and not as private citizens. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. It is undisputed that Plaintiffs Eugenio and Abraham were mandated reporters pursuant to District policy and New York State law, which imposed on them an obligation to call the CPS hotline and report suspected child abuse when they were the first mandated reporters to detect it. N.Y. Soc. Servs. Law § 413; (Gould Aff. Exs. 34, 35). Accordingly, Plaintiffs, in making reports of suspected child abuse, were not speaking as a private citizens, but rather as public employees pursuant to their official duties, and thus, their speech is not constitutionally protected. *See Pearson v. Bd. of Educ., City of N.Y.*, 499 F. Supp. 2d 575, 589 (S.D.N.Y. 2007) (teacher's complaints regarding assistant principal's sexual misconduct toward female students not constitutionally protected because it was made pursuant to official duties); *Barclay v. Michalsky*, 493 F. Supp. 2d 269, 275 (D. Conn. 2007) (nurse's reports of staff sleeping on job and using excessive restraints on patients not constitutionally protected because reports were made pursuant to official duties, even where supervisor discouraged such reports); *Pagani v. Meriden*

*Bd. of Educ.*, No. 05-CV-1115, 2006 U.S. Dist. LEXIS 92267, at *9-12 (D. Conn. Dec. 19, 2006)

(teacher's report of child abuse not constitutionally protected where mandated by district policy

and state law).

 Plaintiffs argue that the Constitution protects their expressions of concern to District

administrators and CSEA representatives regarding Walder's discrimination against African-

American children by preventing Plaintiffs from, or retaliating against them for, reporting

suspected abuse to CPS.  While Plaintiffs make this allegation in their Amended Complaint (Am.

Compl. ¶¶ 7, 13), none of Plaintiffs' written grievances or complaints directed to District

administrators or CSEA representatives include claims of discrimination against African-

American children.  Rather, these grievances indicate that Walder took retaliatory actions against

Eugenio and D'Anna for reporting suspected abuse to CPS with respect to all children at P.S. 29,

not just African-American children.  Apart from Eugenio's deposition testimony, which indicates

that although her November 9, 2005 grievance does not mention discrimination against African-

American children (Gould Aff. Ex. 20), she somehow intended this notion to be encompassed by

her statement (Eugenio Dep. 404-09),[7] there is no evidence to support Plaintiffs' contentions that

they spoke out regarding Walder's alleged discrimination against African-American children.

Sparber testified that in his meetings with Plaintiffs, the only mention of race by Plaintiffs that

he could recall was a single incident in which Plaintiffs said that Walder told Plaintiffs that they

had destroyed an African-American family by reporting a case of suspected child abuse.

---

 [7]  Eugenio's November 9, 2005 grievance states, "I feel I am being discriminated against because I followed Yonkers Public School Policy [and] NYS mandates and because of that I have been harassed[,] slandered[,] singled out placing the children in danger and me and the district liable.  Ms. Walder has made my work place stressful [and] hostile."  (Gould Aff. Ex. 20.)

(Sparber Dep. 175.)   Pierorazio testified that he did not recall race being mentioned at all in his meeting with Plaintiffs.  (Pierorazio Dep. 13-14.)  With respect to D'Anna, she was not a mandated reporter and as such did not complain to District administrators about Walder's alleged discrimination against African-American children.  Rather, she alleged that Walder's harassment of her was in retaliation for grievances she filed in June 2005, which related to her being assigned special education aide duties.  (*See* Gould Aff. Ex. 21.)  Thus, viewing the evidence in the light most favorable to Plaintiffs, the gravamen of their complaints was not that Walder discriminated against African-American children, but that Walder interfered with Plaintiffs' professional duty to report suspected abuse to CPS, thus jeopardizing the health and safety of all children at P.S. 29.  This category of Plaintiffs' speech does not, therefore, constitute speech regarding discrimination problems in a government workplace, which has been held to be a matter of public concern.  *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006).  Rather, this speech, like much of Plaintiffs' other speech, concerns Walder's interference with Plaintiffs' job duties.  (*See* Eugenio's 56.1 Statement ¶ 25 ("the real nature of their complaints[] was that the principal was hindering their ability to do their job").)

The "content, form and context," *Connick v. Myers*, 461 U.S. 138, 147 (1983), of Plaintiffs' expressions of concern to District administrators and CSEA representatives regarding Walder's interference with and hindrance of their professional duties, including their duty to report suspected abuse to CPS, lead to the conclusion that these instances of speech are not protected by the First Amendment.  Plaintiffs lodged complaints about Walder's alleged misconduct including:  disparaging the Nurse's Office in front of parents and school staff (Eugenio Dep. 602-03), giving Plaintiffs menacing looks (*id.* 716), interfering with their

-17-

performance of medical procedures, interfering with their duty to call 911 in emergency

situations, disclosing the identity of a mandated reporter who called CPS regarding suspected

child abuse (McPartlan Dep. 50-52), preventing them from submitting certain reports on time

(*id.* 54), and removing the printer from the Nurse's Office (Gould Aff. Ex. 18).  These

complaints are essentially personal workplace grievances about an abusive supervisor.  They

concern Plaintiffs' workplace conditions and their ability to perform their official duties

efficiently, effectively and without interference.[8]  Plaintiffs, however, argue that these instances

of speech address a matter of public concern because they were aimed at promoting the health

and safety of the children at P.S. 29.  Although obviously the "health, welfare and safety of

young students . . . are matters of importance to the public," *Cioffi*, 444 F.3d at 164, the content,

form and context of this speech require the Court to conclude that it is not protected by the First

Amendment.  Plaintiffs' primary responsibility as school aide and school nurses is to advance

the health and safety of the children at P.S. 29.  As such, all of their job duties are related in

some way to that ultimate goal.  This fact does not, however, transform any job-related grievance

they may have had into a matter of public concern.  *See Weintraub*, 489 F. Supp. 2d at 219-20

(fact that speech touched on a matter of public concern did not entitle it to First Amendment

protection where plaintiff complained about unsatisfactory working conditions through official

---

[8]  The fact that Plaintiffs' complaints were essentially that Walder was impeding their ability to do their jobs distinguishes this case from others in which courts have found that public school employees' speech regarding the health and safety of students was constitutionally protected.  In those cases, the speech explicitly concerned the safety risk to students rather than plaintiffs' workplace conditions. *See, e.g., Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158 (2d Cir. 2006) (high school athletic director's speech regarding sexual assault of student was constitutionally protected); *Morey v. Somers Cent. Sch. Dist.*, No. 06-CV-1877, 2007 U.S. Dist. LEXIS 20265, at *29-30 (S.D.N.Y. Mar. 21, 2007) (head custodian's speech to supervisor regarding asbestos in school gym was constitutionally protected).

channels); *see also Garcetti*, 547 U.S. at 420 ("While the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." (internal quotation marks omitted)).  Rather, because Plaintiffs' duties were to promote the health and safety of P.S. 29's children, speaking out about Walder's interference with their ability to do their jobs was squarely within their official duties, and as such, not protected by the First Amendment.  *See Woodlock v. Orange Ulster B.O.C.E.S.*, 281 F. App'x 66, 68 (2d Cir. 2008) (special education counselor's speech regarding a student and the lack of particular types of special education classes was not constitutionally protected because counselor was responsible for monitoring students' needs and progress and thus in reporting concerns was doing her job); *Shums v. N.Y. City Dep't of Educ.*, No. 04-CV-4589, 2009 U.S. Dist. LEXIS 21229, at *44-45 (E.D.N.Y. Mar. 17, 2009) (although teacher's speech touched on matters of public concern, teacher's duties included making sure students received adequate instruction, and thus complaints regarding impediments to providing such instruction were not entitled to constitutional protection); *Mulcahey v. Mulrenan*, No. 06-CV-4371, 2008 U.S. Dist. LEXIS 665, at *17 (S.D.N.Y. Jan. 3, 2008) ("verbalizing an inability to perform official duties is, itself, an official duty").  In other words, "[i]n reporting [their] concerns[,] [Plaintiffs] w[ere] 'performing the tasks [they] were paid to perform." *Woodlock*, 281 F. App'x at 68 (quoting *Garcetti*, 547 U.S. at 422).

In addition, Plaintiffs made these complaints internally to District administrators and the CSEA through the chain of command.  "[T]he reported cases are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Caraccilo v.*

*Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 410 (W.D.N.Y. 2008) (internal quotation marks omitted); *see Mulcahey*, 2008 U.S. Dist. LEXIS 665, *17-18 (plaintiff's speech to supervisors regarding "conflict in FDNY policy that affected his job responsibilities" and "his unit's productivity, efficiency, and morale" not constitutionally protected where he "spoke pursuant to official duties, through . . . chain of command"); *Weintraub*, 489 F. Supp. 2d at 219-20 (plaintiff spoke as employee where complained about unsatisfactory working conditions through official channels). Thus, Plaintiffs' complaints regarding Walder's interference with their ability to do their jobs efficiently and effectively are not First Amendment protected speech, and they may not "bootstrap [their] complaints about [their] working conditions to matters of public concern" simply because their work relates to safety. *Grennan v. Nassau County*, No. 04-CV-2158, 2007 U.S. Dist. LEXIS 23087, at *27 (E.D.N.Y. Mar. 29, 2007). While the proper reporting of child abuse is as a general proposition a matter of public safety and concern, in the context of this case, the internal complaints related to an allegedly abusive supervisor. Thus, Plaintiffs' complaints to supervisors "concerning matters affecting . . . [their] job duties . . . were made as . . . public employee[s], not . . . private citizen[s]." *Caraccilo*, 582 F. Supp. 2d at 411.

Plaintiffs have, however, presented evidence sufficient to support their contention that their April 4, 2006 letter to Pierorazio, copying the Gannett Suburban Newspapers, the Board of Education, the District Attorney, the Commissioner of Social Services and the County Executive, was First Amendment protected speech. In this letter, Plaintiffs expressed their discontent regarding: Walder's requiring mandated reporters to inform her before reporting suspected abuse to CPS, Walder's disapproval of and retaliation against Plaintiffs for making such reports, and the other Defendants' condoning that alleged misconduct. (Gould Aff. Ex. 39.)

Specifically, Plaintiffs wrote, "[t]he health and safety of our children cannot continue to be compromised through your inaction," and "[w]hile you and the School District apparently have no interest in protecting children against physical abuse, we do!  For that reason this issue can not be longer permitted to languish in-house subject to a District cover-up."  (*Id.*)  Unlike Plaintiffs' other instances of speech, this speech was made publicly, outside the chain of command, and directed specifically at the community and the media.  Thus, Plaintiffs were speaking as private citizens rather than as public employees pursuant to their official duties.  *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) (teacher's letter to local newspaper regarding matter of public concern was protected speech); *Cioffi*, 444 F.3d at 165 (school athletic director's statements during press conference were constitutionally protected when made in a public form directed to community and media).  Thus, the only instance of First Amendment protected speech is Plaintiffs' April 4, 2006 letter.

### 2.  Adverse Employment Action

Magistrate Judge Yanthis found that Plaintiffs did not suffer adverse actions after April 4, 2006, because the complained-of actions would not have deterred an individual of ordinary firmness from exercising his or her constitutional rights.  Plaintiffs object to this finding and contend that the actions taken against them satisfy the relevant standard.  "In the context of a First Amendment retaliation claim, . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes adverse action."  *Zelnick v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted).  "Adverse employment actions include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.'"  *Brescia v. Sia*, No. 07-

CV-8054, 2008 U.S. Dist. LEXIS 35661, at *9 (S.D.N.Y. Apr. 30, 2006) (quoting *Zelnick*, 464 F.3d at 226).  They may also include "lesser actions," *Zelnick*, 464 F.3d at 226, but, they "must be more disruptive than a mere inconvenience or an alteration of job responsibilities," *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. N.Y. 2004)).  "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination."  *Zelnick*, 464 F.3d at 226 (internal quotation marks omitted).

Having found that the only instance of constitutionally protected speech is Plaintiffs' April 4, 2006 letter, the Court will consider in detail only those alleged adverse actions that occurred after April 4, 2006, as any purportedly adverse actions that took place before that date could not have been in retaliation for Plaintiffs' constitutionally protected speech.  *See Brown-Criscuolo v. Wolfe*, 601 F. Supp. 2d 441, 453 (D. Conn. 2009) (actions taken before constitutionally protected speech were not actionable); *Grennan*, 2007 U.S. Dist. LEXIS 23087, at *30 (same).[9]

### a.  Eugenio

Eugenio testified that she has been employed by the District and assigned to P.S. 29 as a Licensed Practical Nurse for twenty-two years (Eugenio Dep. 24), and that during that time, her job duties and description have never changed (Eugenio's Rule 56.1 Statement ¶ 35).  She works with both a registered professional nurse and a school aide, serves essentially the same student

---

[9]  Even if the earlier statements constituted protected speech, the totality of the alleged retaliatory conduct does not meet the *Zelnick* standard.  The pre-April 4, 2006, allegedly retaliatory actions are of the same ilk as those discussed below, and do not amount to adverse action.

population, and has never been subject to a disciplinary hearing.  In addition, she has received

the salary and benefits, including increases, to which she has been entitled.  (*Id.*; Eugenio Dep.

677-86.)  Nevertheless, Eugenio claims that the following, which purportedly took place after

April 4, 2006, constitute adverse employment actions:  Walder required Plaintiffs to make

changes to the nursing logs, Walder interrogated staff members upon entering the nurse's office,

Walder gave Eugenio menacing looks, Walder failed to follow the procedure for students and

staff to request medical attention, and Walder requested copies of nursing logs and other forms

to which she was not entitled.  (Gould Aff. Ex. 40; Eugenio Dep. 704, 713-14, 716, 720-21,

727.)  Further, Eugenio contends that after Carol Blakney became Principal of P.S. 29 in June

2006, Blakney took the following adverse actions against her:  changing the procedure with

respect to the nurse's office calling parents, Blakney dressing as a nurse on Halloween, the

assistant principal Mr. Cohen addressing some of the students' medical concerns, Blakney

making the decision to send a child home with the parent instead of calling 911, and telling

Plaintiffs not to call Mr. McPartlan and Dr. Cordero.  (Eugenio Dep. 656-66.)  Finally, Eugenio

contends that the District has not paid her for days that she was absent from work to attend

depositions in this matter, that Blakney has indicated that her attendance is unsatisfactory, and

that the District required her to prove that her compliance with a subpoena issued in a child

abuse case was related to her employment – all of which she claims are adverse actions.  (Gould

Aff. Ex. 52.)

Considering the complained-of actions in the light most favorable to Eugenio, a

reasonable jury could not find that they would deter an individual of ordinary firmness from

exercising his or her constitutional rights.  The basic aspects of Eugenio's employment have not

been affected by the complained-of actions, and while she may have been unhappy about those actions, they are not more than *de minimis*. *See Eiden v. McCarthy*, 531 F. Supp. 2d 333, 353 (D. Conn. 2008) (assignment to different department was not adverse action where plaintiff was performing same duties with same job title at same rate of pay).  Such actions as menacing looks and interrogations are "petty slights, minor annoyances, and simple lack of good manners," which are insufficient to satisfy the relevant standard.  *Spector v. Bd. of Trs. of Cmty.-Tech. Coll.*, No. 06-CV-129, 2007 U.S. Dist. LEXIS 94354, at *23 (D. Conn. Dec. 27, 2007).[10]

The remaining actions are hardly outside the realm of normal supervision.  For example, the principal's alleged questioning of staff, changing of procedures or requesting additional information are within the purview of the principal and do not rise to the level of deterring a person of ordinary firmness from exercising his or her constitutional rights.  *See Dillon v. Morano*, 497 F.3d 247, 254-55 (2d Cir. 2007) (supervisor's refusal to sign plaintiff's performance review, transfer of plaintiff to another unit, assignment of menial and clerical tasks to plaintiff, and excluding plaintiff from certain meetings were not sufficient to deter a person of ordinary firmness from exercising his or her free speech rights); *Menes v. City Univ. of N.Y. Hunter Coll.*, 578 F. Supp. 2d 598, 615 (S.D.N.Y. 2008) (unfavorable evaluation that did not result in any negative consequences to plaintiff and transfer to position that required plaintiff to learn to use new computer program imposed at most *de minimis* burden and did not constitute an adverse employment actions); *Grennan*, 2007 U.S. Dist. LEXIS 23087, at *30 (transfer to location plaintiff viewed as undesirable was not adverse employment action).  The District's refusal to pay Eugenio for days on which she was absent to attend depositions and expression of

---

[10]  Dressing as a nurse for Halloween does not even rise to the level of a petty slight.

concern regarding her unsatisfactory attendance do not constitute an adverse actions because the District has presented evidence to show that Eugenio is not entitled pursuant to her contract or the law to take paid days off to pursue litigation against the District (Gould Aff. Ex. 52), and Eugenio has not presented evidence otherwise.  *See Casale v. Reo*, 522 F. Supp. 2d 420, 427 (N.D.N.Y 2007) (refusal to grant plaintiff leave of absence not adverse action where there was no entitlement to such leave and it had not been granted to others).  Furthermore, requiring Eugenio to show that her compliance with a subpoena was job-related is not an adverse action, as the undisputed facts show that the District indicated it would pay Eugenio for her appearance pursuant to the subpoena after she confirmed by letter that it was job-related.  Thus, Eugenio has not presented evidence sufficient to raise a genuine issue of fact as to whether she suffered an adverse employment action.

### b. Abraham

Plaintiff Abraham testified that she was hired and remains employed as a Registered Professional Nurse in the Nurse's Office at P.S. 29, which has maintained the same basic programs since she was hired, except that a middle school wing was added.  (Abraham Dep. 596-98.)  In addition, Abraham deals with the same type of students and her responsibilities as school nurse have remained the same.  (*Id.* 600-02.)  Abraham has always had another nurse and, for the majority of the time, an aide working with her in the nurse's office.  (*Id.* 600, 602).  Her pay and benefits have never been reduced, and she has received the pay increases to which she was entitled.  (*Id.* 601-02.)  Moreover, the District has never brought charges against her or subjected her to disciplinary proceedings.  (*Id.* 602.)  Despite these undisputed facts, Abraham contends that she has suffered the same adverse actions which Eugenio contends she suffered.

-25-

As discussed above with respect to Eugenio, the complained-of actions are not such that they would deter an individual of ordinary firmness from exercising his or her constitutional rights. Thus, Abraham has also failed to present evidence sufficient to raise a genuine issue of fact as to whether she suffered an adverse action after April 4, 2006.

### c. D'Anna

Plaintiff D'Anna has been at P.S. 29 since she was hired by the District. (D'Anna Dep. 10.) She was originally assigned to a kindergarten class for seven years and later, after requesting to be transferred, was assigned to the Nurse's Office in 1999. (*Id.* 32-35; D'Anna's Rule 56.1 Statement ¶ 12.) D'Anna's title is and always was School Aide, although she believed that upon her transfer to the Nurse's Office, she became a nurse's aide. (D'Anna Dep. 39, 54, 203; D'Anna's Rule 56.1 Statement ¶ 13.) Her hours, wages, and benefits have remained consistent during that time, and if anything, have increased consistent with District policies and procedures. (D'Anna Dep. 205.) Moreover, D'Anna's responsibilities as an aide have remained basically the same. (*Id.*) In addition, she was not assigned to any task outside the nurse's office after February 16, 2006. (D'Anna's Rule 56.1 Statement ¶ 35.) In 2006, D'Anna reported to CPS the only case of suspected child abuse she observed. (D'Anna Dep. 183-84.) Despite these facts, D'Anna contends that she has suffered the same adverse actions as Eugenio and Abraham since April 4, 2006, with the additional claim that Walder treated her as though she had "cooties." (Gould Aff. Ex. 40.) For the reasons explained above, the complained-of actions do not rise to the level of adverse employment actions. Accordingly, Defendants' Motions for Summary Judgment should be granted with respect to Plaintiffs' First Amendment retaliation claims.

### C.  Section 1981, Title VII and New York State Human Rights Law Section 296[11]

Magistrate Judge Yanthis recommended dismissal of Plaintiffs' discrimination claims because they have not submitted evidence of discrimination by their employer against them. (Report 19-20, 27-28.)  In fact, Plaintiffs admit that they have not been discriminated against on the basis of their race, but rather because they complained of Defendants' discrimination against African-American children on the basis of their race.  (Pls.' Mem. of Law in Opp'n to Mot. for Summ. J. 6; Eugenio's Rule 56.1 Statement ¶ 11; *see* Eugenio Dep. 463.)  Having failed to present evidence of discrimination against them by Defendants, Plaintiffs cannot establish a *prima facie* case of discrimination.  *See Holcomb*, 521 F.3d at 138 (*prima facie* case of discrimination established by showing plaintiff is member of protected class, is qualified for position, has suffered adverse employment action, and circumstances giving rise to inference of discriminatory intent).  Plaintiffs have not objected to these portions of Magistrate Judge Yanthis' Report.  Accordingly, I have reviewed them for clear error, and finding none, adopt them as the decision of the Court.[12]

---

[11]  The substantive standards of analysis that apply to claims of discrimination pursuant to Title VII also apply to claims of racial discrimination pursuant to Section 1981 and [NYSHRL]. *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999) ("A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.)

[12]  In addition to having failed to present evidence of discrimination, Plaintiffs have not presented any evidence of a conspiracy, which is necessary to sustain a 42 U.S.C. § 1985 claim. *See Butts v. N.Y. City Dep't of Hous. Pres. & Dev.*, 307 F. App'x 596, 598 (2d Cir. 2009) (affirming dismissal of Section 1985 claim where no evidence of conspiracy was presented); *Richardson v. N.Y. City Health & Hosps. Corp.*, No. 05-CV-6278, 2009 U.S. Dist. LEXIS 25247, at *51 (S.D.N.Y. Mar. 25, 2009) (Section 1985 claim dismissed where plaintiff failed to provide evidence that defendants acted in concert with racial or discriminatory animus).  Thus, Defendants' Motions for Summary Judgment are also granted with respect to this claim.

### D.  Title VII Retaliation

Magistrate Judge Yanthis recommended that Defendants' Motions for Summary Judgment be granted with respect to Plaintiffs' Title VII retaliation claims because Plaintiffs failed to present evidence sufficient to raise an issue of fact as to whether they engaged in protected activity.  *See Kessler*, 461 F.3d at 210 ("As to the 'protected activity' element of a Title VII . . . retaliation claim, the plaintiff need only have a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.").  Judge Yanthis concluded that Plaintiffs could not have had such a belief where they admit the discrimination to which they claim to have objected was not employment-related, but rather related to the students of P.S. 29.  Plaintiffs have not objected to this portion of the Report.  Having reviewed it for clear error and finding none, I adopt it as the decision of the Court.

### E.  Section 1981 Retaliation

Magistrate Judge Yanthis recommended that Plaintiffs' Section 1981 claim be dismissed because Plaintiffs failed to submit evidence that they complained of discrimination actionable under Section 1981– specifically, that Defendants discriminated against African-American children in connection with a contract right.  (Report 28-29.)  Section 1981 provides:  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981.  The term "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the

plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  To establish

a prima facie Section 1981 retaliation claim, a plaintiff must prove that he "(1) engaged in

protected activity, (2) that his employer was aware of this activity, (3) that the employer took an

adverse employment action against him, and (4) that a causal connection exists between the

alleged adverse action and the protected activity."  *Paulino v. N.Y. Printing Pressman's Union,*

*Local Two*, 301 F. App'x 34, 37 (2d Cir. 2008).  The Supreme Court recently held that Section

1981 "encompasses a complaint of retaliation against a person who has complained about a

violation of another person's contract-related right."  *CBOS West, Inc. v. Humphries*, 128 S. Ct.

1951, 1954 (2008).

Plaintiffs' Section 1983 claim fails because they have not presented any evidence to

show that they engaged in protected activity – that is, that they complained about a violation of

either their or others' contract-related rights on account of race.  *See Domino's Pizza, Inc.*, 546

U.S. at 479-80 ("[A] plaintiff cannot state a claim under § 1981 unless he has (or would have)

rights under the existing (or proposed) contract that he wishes 'to make and enforce.'").  It is

undisputed that Plaintiffs did not complain about a violation of their contract-related rights on

account of their race.  Rather, they claim that they complained about racial discrimination

against African-American students at P.S. 29.  Such a complaint does not, however, constitute

protected activity pursuant to Section 1981 because the alleged discrimination by Defendants

against African-American students did not impair such students' rights to enter into contracts or

rights under any existing contractual relationships.  *See Foxworth v. Am. Bible Soc'y*, No. 03-

CV-3005, 2005 U.S. Dist. LEXIS 16105, at *14 n.5 (S.D.N.Y. July 28, 2005) (granting summary

judgment as to § 1981 claim where defendant's failure to support marketing efforts targeted at

-29-

African-American community did not interfere with contractual right on account of race), *aff'd*,

180 F. App'x 294, 294 (2d Cir. 2006).  There is no contractual relationship between P.S. 29's

students and the school or the District, and therefore, Defendants' Motions for Summary

Judgement should be granted as to Plaintiffs' Section 1981 retaliation claim.  *See Rodriguez v.*

*Int'l Leadership Charter Sch.*, No. 08-CV-1012, 2009 U.S. Dist. LEXIS 26487, at *19 (S.D.N.Y.

Mar. 30, 2009) (dismissing § 1981 retaliation claim where teacher complained regarding sub-par

educational services provided to students and did not allege defendants violated students'

contract-related rights on account of their race); *Distiso v. Town of Wolcott Bd. of Educ.*, No. 05-

CV-1910, 2006 U.S. Dist. LEXIS 83835, at *22 (D. Conn. Nov. 16, 2006) (Section 1981 claim

dismissed where plaintiff did not allege contractual relationship between student and public

school system); *Priester v. Starkville Sch. Dist.*, No. 03-CV-90, 2005 U.S. Dist. LEXIS 46780, at

*7 (N.D. Miss. Sept. 26, 2005) (Section 1981 claim dismissed where student's public education

was not based on contractual relationship); *Woods v. Miamisburg City Schs.*, 254 F. Supp. 2d

868, 876 (S.D. Ohio 2003) (Section 1981 claim dismissed because provision of public education

to taxpayers is not based on contractual relationship).

**F.  Equal Protection**

Magistrate Judge Yanthis found that Plaintiffs failed to present evidence sufficient to

raise an issue of fact as to the elements of a third-party standing Equal Protection claim.

Plaintiffs have not objected to this portion of the Report.  Accordingly, I have reviewed it for

clear error, and finding none, adopt it as the decision of the Court.

**F.  New York Human Rights Law**

Judge Yanthis recommended that Plaintiffs' New York State Human Rights Law claims

be dismissed because Plaintiffs did not submit evidence that Defendants discriminated against them. Plaintiff has not objected to this portion of the Report. Accordingly, I have reviewed it for clear error, and finding none, I adopt it as the decision of the Court.

**III. Conclusion**

For the foregoing reasons, the Court adopts the Report to the extent it is consistent with this opinion. Defendants' Motions for Summary Judgment are **GRANTED**. The Clerk of Court is respectfully directed to terminate the pending motions (Docs. 28, 32, 34, 37) and close the case.

**SO ORDERED.**

Dated: July 2, 2009
       White Plains, New York

CATHY SEIBEL, U.S.D.J.